Call the last case please. Good morning, Your Honors. May it please the Court, my name is Andrew Eichner. I represent the petitioner Apollon Mitabhati. And I'd like to reserve five minutes for rebuttal, if I may. Your Honor, this case, Your Honors, we believe this case is the only case out there where the five Eckert factors, where four of the five Eckert factors favored removal. And removal was denied based on the finding that a reasonable and practical visitation schedule could not be crafted for A.J. Singh to visit his daughter Sonia. And I'm going to refer to him as A.J., daughter is Sonia, my client is Mita for convenience purposes. In this case, the Court found that the predicate factor for removal, that there was a likelihood that the move would enhance the well-being, the life of the mother and the child was found. The Court found that my client, Mita, had an appropriate motive for the move consistent with the fact that it would improve her and her child's life. The Court found that A.J. did not have an improper motive for resisting the removal and that he had exercised his visitation and had a close relationship with his child. The Court only found that notwithstanding those four factors, that a reasonable visitation schedule could not be crafted and denied the petition for leave to remove. That holding is completely and utterly inconsistent with the Illinois Supreme Court case of Collingburn, which is the leading case, I believe, on removal and direct and persuasive precedent, mandatory precedent in this case. I think what happened below, Your Honors, was that the trial court elevated the needs and wishes and wants of A.J. and made those superior to the best interest determination, the best interest of the child, which is completely inconsistent with the holding of Collingburn and the cases cited in our briefs. But particularly Collingburn, which says, though, the relationship of the father with the child is important. The most important factor is what will be the benefit or effect on the child of the leave to remove. Excuse me. The standard of review is? Manifest way to the evidence on the removal issue. Now, how did the judge reach that? How do you get around this? The judge heard all of this testimony from everybody, I think, and made a decision. He did. How is it against the manifest way? It's against the manifest way to the evidence, Your Honor, because, first of all, you have to have a calculus in which that manifest way is determined. That's the case law. That's the case law. The case law says these are these five factors. And when you have four out of the five of them, it would appear to be that if you. Four out of five? Four out of five. Well, three of them. What's the third factor? The third factor is the motive of the parent resisting. Yeah. And she said it was genuine. The judge, Judge Lopez, he said it was genuine, yes. The fourth factor is, relates the visitation right to the noncustodial parent. You're making an argument that her finding on the fourth factor is against the manifest way of the evidence. I'm making an argument that the entire decision is against the manifest way of the evidence. What about the fourth factor? The fourth factor. That's his visitation. His. That's A.J.'s visitation, the father's visitation. That's a neutral factor in this situation. I don't know. There's no evidence how that is positive or negative. That's a neutral factor. It's not even discussed because A.J. did have visitation, and it was a, and he did exercise it, and I'm not disputing that he exercised his visitation and that he had it and that the removal would impact on that. But that in itself. So if it's neutral, now we're down to four factors. If neutral, it's not a plus, it's not a minus. Well. It's even. That, if it's not, there is, that one really wouldn't, there's no way really for that factor, if you really look at it objectively, for that to be a positive. That's either a negative or neutral. What did the trial court say about it? Nothing. What did the psychologist say about it? About that fourth factor? Yeah. About the infringement on the noncustodial parent's rights to visitation because of the behavior of your client. The trial court, well, the expert, whose opinion I don't believe should have been admitted, but assuming that it was in evidence, which it was, the court, her finding was, quote, that removal may possibly have a negative effect in the future. Now, I don't know what that really means other than that something could happen in the future. That is not a specific directive or finding or opinion. I could have given that opinion. I could tell you, and anyone in this room could tell you, that if the father moves from Arlington Heights, I mean the child moves from Schaumburg to Fayetteville, that in the future might possibly have a negative effect on the relationship of the father and the child. That is not the test to determine whether removal is appropriate because each and every case says there will be a diminishment of the father's parenting time when there is removal. That is, to hold otherwise is to give the father an impermissible veto, which is, I believe, what happened in this case. That A.J.'s visitation, if you read the judge's decision, that he couldn't craft a visitation schedule that would replicate the visitation he had, makes removal impossible. So that's what the therapist, the psychologist, said about removal. It might possibly have a negative effect. The judge did not attempt to craft a reasonable and practical visitation schedule, which I believe, with all due deference to the trial court, was an abrogation of his responsibility. Trial court judges every day craft reasonable and practical visitation schedules for people who live in different cities, who live in different counties, and who live in different states. There is a, it is not very, it is not incredibly difficult to do so. In this case, as opposed to Collingborn, which makes this a better case than Collingborn, in this case, Mr. A.J. is a senior executive vice president with United Airlines and flies for free, unlimited, on United Airlines, the only consequence being it may be taxable income to him. His daughter, Sonia, flies for free. His new wife, Kendra, flies for free on United Airlines and has other reciprocal agreements with all other airlines. There are over 62 flights between Chicago and O'Hare and Fayetteville and Raleigh-Durham, which is the larger airport near Fayetteville, daily, three or four per hour. It is inconceivable under these circumstances where a man earns in excess of $400,000 a year, has unlimited access to airline flights between two of the largest airports in the world, Chicago and Midway, and at one of the hubs in the southeast at Raleigh-Durham, that a reasonable and practical visitation schedule could not be crafted. And the judge said that this is particularly true where Mita, at trial, testified that as to what she believed a reasonable visitation schedule would be, which is the standard schedule generally for out-of-state parents, which is longer periods of time and less frequency. That calculus is done every day in court. So half the summer, every spring, alternating Thanksgiving, half of holidays, whenever he could come in town, and long weekends usually in, let's say, Chicago. And that testimony was unrebutted. And Mita even offered to pick up A.J. at the airport in Raleigh-Durham and drive to Fayetteville, which is about an hour, an hour and a half drive. And surprisingly, where the judge found that a reasonable visitation or practical one could not be crafted, when I asked A.J. on the witness stand, could you please tell the court what you believe would be a reasonable parenting schedule if Mita were given leave to remove, the judge opposing counsel objected, and it was sustained. I couldn't even ask him the question of did a schedule exist, and then the judge determined that one didn't exist. So how can that be appropriate or fair under these circumstances? And what happens, trial became not about what's in the best interest of Sonia. It became what is, what, did A.J. have all of his visitation from the date of the divorce to the date of the trial? And I want the court, when reviewing the briefs, I'm asking the court, I got what I want, I'm asking the court to, what I tell in most cases is look at what the people did, not what they say they did at trial, because you can say and allege anything in a pleading or in a courtroom, particularly when the harsh glare of judicial scrutiny is on, but look at what they did when nobody was looking. Well, what happened in this case? In 03, they separated. A.J. left the marital residence and left Mita at home with her then one-and-a-half-year-old daughter. Divorce was filed in April of 04. Six months later, a joint parenting agreement was entered prior to the financials being resolved. Six months into it, and that schedule is still in effect today. Now they get divorced. The financial settlement is not done and the divorce is not entered until July of 05, another year and a quarter. Now in divorce language, that means that she didn't hold up custody for the money. She did it 12 months before. From the date of the joint parenting agreement, this is very important, in April of 04 to 09-06, over approximately two-and-a-half years, until she told A.J. that she wanted to leave to get remarried and move to Fayetteville, there was not one court proceeding instituted pleading. Any problems between the two of them was brought to the court's attention. The e-mails that she kept from that period of time, she being Mita, were 18 e-mails. One, and I asked the court to read them, one dealt with visitation. It wasn't a problem. It was just rearranging the schedule. One, the other ones dealt with who was going to pay for daycare and did you send me the check, and they were all very businesslike. Now, September 06, she tells him at a meeting that she wants to leave the state. What is the next thing that happens? Now that that comes out, he files a petition for visitation abuse, alleging events that occurred in 2002 and 2003 when they were still living together and the divorce proceeding hadn't happened. Then he sends her 144 e-mails from 09-06 to about April 08, when the trial began. A hundred and forty-four e-mails. He files a petition for visitation abuse before she even files a petition for leave to remove. What does that have to do with the removal, please? What does that have to do when the judge determines or impugns her motive for leaving and when the therapist says there might be a negative effect because she may not be able to foster his relationship, the fact that she has fostered it, that the allegations of non-fostering occurred right when the case started. Didn't the trial judge find that your client coached the child to tell falsehood to Dr. Starr or whatever her name was in order to assist her position? She found your client not credible. She found your... It's a he, the judge was a he, excuse me. Pardon? The judge was a he, excuse me. He found your client not credible. Those are the trial judges. No, the judge found, if I may judge, the judge did not find my client not credible. He found A.J. more credible than her. He did not find her not credible. He did not find that Dr. Starr testified, and in her report, that Mita told Sonia to tell the therapist that she wanted to leave with the mom. I asked for an in-camera interview. That is not the same as that she coached her to lie. And I would submit to Your Honor that that fact alone, which can be interpreted in so many ways that if I go in with a therapist, tell the truth, if you want to go, say you want to go, it should not be determinative of this case. And in particular, Judge, I want to just, because I know I'm going to run out of time, in 5, this court, Judge Lopez based his decision on the failure to craft a reasonable visitation schedule, parroted the exact same words that the child's representative said in her impermissible closing argument. And I think that under 506, and this cannot be gotten around, under 506, it is mandatory, the word shall, that the child's representative shall disclose her position in a pretrial memorandum circulated to the parties in the court before the trial. The child's representative shall not issue, offer an opinion or recommendation and only make fact-based legal, evidence-based legal arguments. If you read her, the child's representative's closing argument, it is replete with everything it says, the statute says you cannot do. She said, I want you to be hard on removal, Judge. I want you to, on behalf of this child, to deny removal, Judge. I want you, you cannot craft a reasonable and practical visitation schedule in this case, Judge. Judge, as we're speaking, Sonia is happy as a clam in daycare. Playing with her food, which was real-time saying what happened, it's like if I said right now my client is at home with the child, taking care of her, and can't be here today, that would be the same kind of argument. She said that if she gets leave to remove, she won't be able to play soccer like she plays here, which was a misstatement of the fact because the child could not play soccer here. Now, there's no way that you can get around that. I didn't waive the argument. They presented that, that I waived it at the trial court. The trial court rejected that argument. I can't waive a statute that's for the benefit of the child. I don't, the statute doesn't allow for waiver. It's not there for my benefit. That is a reversible error. That is prejudicial because the only way you usually get around those arguments on the appellate level is to say it was harmless. Well, that's not harmless when you parrot the exact same thing the child's rep says. And that's part of why the divorce division has the reputation sometimes as the Wild West because the rules don't apply. Well, that's a really simple rule that should have applied. That one is not even a complex rule. Counsel, let's hear from your opponent. We'll give you some new book. Thank you. Good morning. May it please the Court. I'm Celia Gamrath. I'm shoulder to canton flag here on behalf of A.J. Singh. Counsel made a comment that couldn't be more true. You look at people, at what people did when no one was looking, and you look at what they did when people were watching. In this case, Nita knew the court was watching, yet she still continued to be non-cooperative, non-accommodating, non-flexible, non-informing to A.J. Singh. There was a paramount consideration in the court denying removal, saying if she was going to remove this child, we need to make sure that there's some protections in place to make sure that A.J. and his child continue to have such a close, warm, loving relationship, with not just the quantity of time, but the quality of time that they enjoyed. Instead, we had a parent who continuously refused additional time for the father when he asked, including on such occasions as his wedding, including on occasions when he was out of town in Europe, came home, wanted to see his daughter, and was refused access, including no telephone calls on important holidays or birthdays. We also have a mother who refused to tell the father about certain things, like extracurricular activities, or about the time that the child sprained her ankle, or about the time that the child got shots. And we also have a parent who enrolled the child in school without notifying the father. She didn't just do it once. She did it twice, and she did it knowing that Mr. Singh objected to the school that she chose. This is despite their joint parenting arrangement that requires joint decision-making. It requires consultation, and it requires mediation. Mita didn't seem to care. And imagine how she would act or conduct herself if the court wasn't watching and if she was all the way in North Carolina with this child. Another fundamental problem, of course, as Justice Hoffman noted, was the coaching of Sonia. The expert and the court found that this was extremely damaging to the self-esteem of an 8-year-old to be placed in this position. Also, the allegations that Mita made and her fiancé made to the expert about A.J. Singh not having contact with his daughter for five years, the record is undisputable that this was and is a very involved parent. This is a man who not only has five overnights with his child every 14 days, but sees his child seven out of every 14 days. In addition, substantial time over the summer, vacations, alternating holidays. If you look back to what Mita was proposing, she said, we could continue to share the summers like we do now. You could continue to have half the holidays like you do now. And, by the way, if you want to travel back and forth, you could do that too. If the trial court finds, as a matter of fact, and let's say that we were to find that it's not against the manifest way of the evidence, that the removal of the child because of the behavior of the mother would frustrate the visitation privileges of the noncustodial parent, is that sufficient to deny removal? It would be sufficient, but the court isn't faced with that question because here we have more factors weighing in its favor. We have the accurate factors, and it's a balancing act. There's no case law that says one's enough or one isn't enough. Here the court, in its discretion, gets to weigh those factors. And we have the factors. We have the one. Will it enhance the general quality of life for the child and the parent who wants to move? Let's talk about that one just for a second. Yes. In this case, at least from what I gather from a reading of the briefs and the record, didn't the judge essentially say that probably comes down on the side of removal? Didn't he think the quality of life would be better in whatever, North Carolina, than it would be here? And in addition to that, the mother said, I won't have to work anymore. I can be a full-time mom. Now, wouldn't that fact just standing alone lead you to think, hey, sounds like her quality of life would be a lot better in North Carolina than it would be in Arlington Heights? If you look at it from the material aspect, bigger house, country club, pool, great for Mita. And that's really what the court found. This would enhance her general quality of life. I'll read it to you. Therefore, given the record, the court finds that the proposed move has the likelihood for advancing the general quality of life for both Mita and for Sonia. Yes, and the sentences before that also talk about the material aspects, the bigger house, the pool, and so forth. And then a couple paragraphs after that, the court goes on to talk about how this would damage the relationship between A.J. and Sonia. So if we took out that sentence and just looked at it in isolation, yes, that would be a factor favoring that. But if you look down to what this is really about, it's about a relationship between a child and her parents, not just her mother, not just her father, but maintaining a relationship between both. Not flying into North Carolina where neither Sonia nor Mita have any family, but injecting this 8-year-old child into a new person's family so that she could live in her, in the fiancé's home. It's not Sonia's home. The fiancé. I mean, that's what happens in divorces, right? It can happen. New families. New families, and Sonia is experiencing that with A.J. and his family and is a part of that family and very, very connected. But in this situation, we have a case where we have a mom who deliberately decided to search worldwide for a new husband, despite her agreement to limit her geographic home to not only Illinois, but their parenting agreement, which is unusual, actually says, we agree to live in Cook County. I think it was no further south than Roosevelt Road or something like that. I mean, with actual parameters to say it's important to us that both parents are close to our child. She made that agreement, and then when questioned about it, she said, well, it wasn't important for me to stay local. Well, for you, Mita, it may not have been, but you and your ex-husband decided that it was important to your child that she remain stable, that she remain close and connected to both parents. And so in terms of inserting her and injecting her in this new place where she has no family, she has a fiancé, his home, his country club, his schools, this man has no obligation to take care of Sonia. And we don't know how that would play out, but what we do know is if something should go wrong, guess who is displaced again? It is that child. Mita may want to take this risk for her own good, but it's not for the good of her child. And when opposing counsel talks about this case being about AJ and his needs and his wants, no. I'm back to the question that I asked. Assume we agree with the analysis of the trial judge, that this removal will frustrate this man's relationship with his child because of the prior behavior of the wife. Assume that that's true. That's what the trial judge found, found him more credible than her. If that's the case, is that sufficient to deny removal? It is sufficient to deny removal, especially when we're dealing with the manifest weight of the evidence standard. Here we have a trial judge who looked at these parties in this case for a year and a half, heard eight days of trial, made specific credibility determinations, heard from an expert, heard from witnesses, heard from the fiance, heard from the stepmom, heard from the parties themselves, and came to this conclusion and said, it's too high of a price. It's too high of a price to allow this child who has lived in this same home, this same community, this environment, this is the life that she leads. She's in school most of the day. It's not as though we are dealing with a one- or two-year-old who actually would benefit more from mom being home there the full 12 hours during the waking hours. We've got a child who's in school most of the day. You can't do it both ways. You can't run with the hounds and hide with the fox. Either this thing is against the manifest weight of the evidence or it isn't. This trial judge found that removal would benefit both the mother and the child. Then went on to find, as a matter of fact, based on the record, that the removal would impair the visitation rights of the father because of the mother's prior activity and because of the credibility findings and because of Starr's report. So my question is, again, I'm going to ask you the question again. Assuming that this trial judge is correct in all of his findings vis-a-vis the Ecker fact, is the finding that the removal will substantially impair the visitation rights of the father sufficient to deny removal? The answer to your question is yes, that would be enough to sustain this ruling. I'm further assuming that it's over and above the normal impairment that one suffers when you take a child and move the child hundreds of miles away from the father. But there's something more here, as the trial judge found. And there is something more. But, you know, if you look at the Ecker's factors, we've got two that really focus on that visitation and frustrating that visitation relationship. We have the effect of the noncustodial parent's visitation right, and we also have whether a realistic and reasonable visitation schedule could be achieved. Here we have the court finding that, you know, we certainly can't replicate the quality, I mean the quantity, but nor can we replicate the quantity of time. And that's really significant. And on top of it, we do look at the purposes of the... Isn't that true though in every removal case? In every removal case, the easy access when people live near each other is going to change. It's going to change. And it's not going to be the same. But let's look at what's realistic and let's look at what's reasonable. In not every case do we have a parent who has joint custody and joint decision making, but also a substantial number of days with his child every week and overnights. And although my opponent takes issue with our characterization as nearly 50-50 time, the fact is if you do the math, it's nearly equal time. He sees his child seven out of 14 days. That's not going to happen, we know. Number two, what is quality parenting time? Right now we have a child who benefits from both parents being in the picture to put her to bed at night, to wake up with her in the morning. This is always true. These are heartbreaking cases. They're always heartbreaking cases. It would be true. And the statute is set up and the cases are set up to say we acknowledge this is, you know, this is very, very hard to do. But there's always going to be pain in these situations. There is going to be. I mean, we start there. And then we move on. We say is there no way that this pain can be lessened? And isn't that where we come to the place where the court says there's no way that this, an arrangement can be worked out where visitation can work? Okay. Well, as to that, a couple of things. Number one, Colleen's born, which Mita relies on heavily. She says, well, in that case, it was okay. It worked. That's what you should follow. But the Colleen's born mother bears no resemblance to Mita. And that's because those protective factors that were articulated by Dr. Starr do not exist in this case. And I had mentioned it, and I certainly talk about it in my brief, but it's worth repeating. We don't have a mother who has been cooperative. We don't have a mother who's been flexible with extra parenting time. She says she will be, but her past actions have not demonstrated that. And that was what was most concerning to the court and to the expert in this case, to say she says it, but she doesn't mean it. And opposing counsel made that comment as well. You look at how people act because their past behavior is indicative as to what they'll do in the future. Another fact that seems to be significant to me in trying to look at this, that the court focused on the difficulties with crafting a visitation order. This is unusual. We have someone, a non-custodial parent, who has the ability to fly, to be there, wherever it is. I mean, you can drive for a couple hours to Galesburg, Illinois, or you get on a plane for no price, really, and to be in Fayetteville. Isn't this a unique set of facts where this man has the ability, where most don't, to be able to travel fairly easily to see the child? Well, in terms of cost, let's put the cost issue aside, because he does get taxed on the income, but that's not the real strain on this. Here we have a place that is not very convenient. We know, and it's undisputed, that round-trip, it's 11 hours. That doesn't count for flight delays. It doesn't count for waiting time at the airport. It's 5 1⁄2 hours one way, and it's 5 1⁄2 hours back. This is not how the judge decided this case. The judge found that the cost to the father is minimal, but then found that all of this was irrelevant because of the mother's past behavior in the testimony of Dr. Starr. She would not facilitate a joint parenting agreement. She hasn't in the past. And so, I mean, I suppose my question becomes, assume that we accept the trial judge's interpretation of the facts and the weight that he gave to the facts, is that enough to deny removal? And again, same answer, yes, that would be enough. But here, this court is affirming the decision to deny removal. It's not just that particular finding. And, of course, this court could affirm on any basis. And when we look at the factors, it wasn't that the court found the rest irrelevant. It just found that this one really skewed in favor of denying the removal because we have good legitimate motives for AJ. But that's not what the trial judge said. They did find it irrelevant. However, I'm quoting, the court finds this issue that's the minimum cost to the father, finds the issue becomes irrelevant when the court sees the lack of protective factors as described by Dr. Starr that Mita has failed to demonstrate over the history of the party's joint parenting of Sonya. Yes, and the court found that. What are these protective factors? From whence do those come? I mean, there's no statute or anything covering that, is it? There is not a statute covering that. What are the protective factors? The protective factors include cooperation. Cooperation between the spouses, right? Yes, the ability to compromise. The respectfulness in sharing information and to be inclusive with the other parent's life. These come from research. They come from Dr. Leslie Starr. But they come from case law. But they also come from the premise of the Illinois Marriage and Dissolution of Marriage Act, which talks about involvement of both parents. It talks about mitigating the harm. It talks about that cooperation and that consistency. And there have been custody cases where people have lost. There was only one e-mail complaining about problems over X number of years. Kind of sounds to me like they're being pretty cooperative as opposed to one a week or whatever. Okay, and then again, let's look at what happened since A.J. said, No, I don't want my child to move. Well, we know from his testimony, which was found credible, that the fiancee threatened A.J., said, I'll make your life a living hell if you don't go along with this. Made threats and made good on those threats. We know there were anonymous letters sent. We know that there was a statement by Dr. Desai to the examiner to say, A.J. has no relationship with this child. This is the type of person that we want to send her to live with? This is the person that we want to model? No, that was too great. That was too much. And aside from those e-mails, the court found those irrelevant because the court said, those are going to come into court and we don't need to look at that. But what we do have is a history here, a pattern. No, A.J. didn't run into court every time Mita denied him visitation. He was working together, hoping to cooperate and minimize litigation. But then it got to the point where Mita put her foot down and said, you don't do what I say, you'll see what happens, and I'm in control and try to assert that control. I was getting to the point to say, there have been custody cases where people have lost custody of their child because they have frustrated visitation, because they have frustrated and interfered with the relationship between the child and the other parent. Custody was taken away because of that. And so I submit to you to tell Mita that she can't move this child to North Carolina to displace her from her father who is so involved, who had the good motives, who has exercised his visitation diligently and religiously and has much more than what you would consider a standard visitation schedule. Yes, could he fly on United only for free? Yes, he could. Are there other costs? Of course. Justice Hoffman said, well, those were minimal, and the court said, I'm going to ignore those. But the court only ignored those because it found that that one aspect was so overwhelming that it didn't matter what the cost was. In this situation, the court saw Mita's ill will and intent here, and the intent to frustrate the relationship between Sonia and A.J. And so these costs wouldn't have become so minimal if perhaps that factor wasn't so striking. But I submit to you, again, A.J. is the one who works. His time is not unlimited. There's costs associated with hotels, and there's costs associated with not tucking your daughter in at night in her bed in your home. That's what we're saying. This is part of the heart. These things happen in a mobile society. It's hard for you. And there are some cases. Sure. And there are cases where the courts have allowed removal, and in those situations there's been because the visitation hasn't been so liberal or because the parent was truly cooperative and said, I'll fly the child, and I'll do this, and you could have as much time, and I've demonstrated that. And in fact, my proposed schedule will give you more time than you had before. Those are the cases cited in this brief. But there's a slew of cases cited in my brief where it's been similar facts in the same situation, and the court says ---- You know, in each site cases, in each site cases where we've affirmed removal, we've reverted, we've affirmed the trial judge when he granted removal, we've affirmed the trial judge when he denied removal. This is manifest way to the evidence. There is no right answer. The question is, is there ---- is the opposite conclusion clearly apparent? And my question to you is, once the trial judge makes the finding that the removal, because of the mother's past behavior, will frustrate the relationship with the father, then in that particular case, is that sufficient to support a denial of removal? I mean, that's what this case boils down to. It's that simple. Right. It is simple. And one factor which is supported by the evidence, and no ---- and it wasn't arbitrary, and it wasn't out of left field, yeah, that's what you do. You affirm with the manifest way to the evidence. Okay. Let's hear some rebuttal from your side. Thank you. Thank you. You know, the case that you primarily rely on, was it Claiborne? Collingborn. Collingborn is a case where the appellate court reversed the trial court. The Supreme Court merely reinstated the circuit court's exercise of their ---- of their discretion in the case and said it wasn't against the manifest way to the evidence. This isn't the situation where the Supreme Court reverses what the trial court does and says you can't consider this, you can't consider that. It's an affirmance. And for every case you can cite that says that removal was proper, they're going to be able to cite a case that says removal was improper. I disagree with that, Judge. It's all manifest way. Judge, they could not cite one case, and they strong cited them in our brief, and I draw your attention to my reply brief, that removal was denied in a situation where the court found that the person's motives were pure and that the move would be consistent with the child's best interest. They could all ---- and there was not one case that they cite. That's why they don't put any discussion of them in their brief. They cite eight cases and a strong cite. I have me a case that says that if the trial court finds that because of the past behavior of the custodial parent that removal will frustrate the relationship between the noncustodial parent and the child, that removal was proper. Judge, the answer to that question is, if I may, is that that's the problem with this decision because, as you said, it's inherently inconsistent. You cannot find that a move would be good for a child and at the same time find that it would frustrate visitation. So one of those findings is wrong, Judge, and my suggestion to you is that the wrong finding is the one where A.J. really wants to have it both ways, that she has frustrated his visitation. How can she have frustrated his visitation if he has ---- and if you look in his brief, it says that he's an involved parent. He goes to all the activities. On page 19 of his brief, he speaks to her every night. He goes to karate, tumbleweeds, so on. You can't have it both ways. You can't be such an involved parent that to leave would frustrate your relationship and at the same time accuse the party who you've lived in joint custody with for the last five years of interfering with your parental rights. That's inconsistent. Either she interfered or she didn't. And if she didn't, what's more likely than not is that his good relationship is as a result of both of their work. And it's borne out by the record because instead of just guessing whether, as Judge Lopez said, that she didn't adhere to the highest principles of the joint parent agreement, look at the record. Has there been a finding that she has been guilty of visitation abuse? Has there been a petition filed for rule to show cause? Has there been any adjudication that she has in any way, shape, or form deprived him of any visitation? The answer is no. In fact, the judge found that the petition for visitation abuse he filed after he found out that she was going to leave was done for litigation strategy and dismissed it. Dismissed it. And in that amended petition is all the instances of alleged interference. So that petition which alleged the interference that is now the basis for his finding that visitation would be frustrated was dismissed. The e-mails that formed the basis of you didn't give me the wedding, you didn't give me my birthday. All of those the judge found as irrelevant and not persuasive because they were done when litigation was pending. Yet those are the same incidents that the judge sort of makes a finding that somehow she would frustrate his visitation. You can't have it both ways. And to say, as opposing counsel said, that she didn't accede to additional requests. Well, is that a basis for denial of removal? Is that every visitation is worked out perfectly but you don't accede to additional requests? Because all that means is that A.J. has to ask for additional time. You don't agree and you're a bad parent and you can't remove. And in fact, if your honor looks at their motion for additional parenting time in the summer of 08, they wanted the entire summer because of the fact that she might be given leave to remove during that summer. And she did not agree to that. And that's in the judge's finding as a basis for her being not cooperative. So you could ask for anything, not agree to it, and you're a bad person. And what's also offensive in this case, judges, let's talk really about, because we're talking about A.J. all the time and his visitation. Well, he has a good relationship with the child. And I guess for her to have won this case, it would have been better for her not to agree to joint parenting in 03, not to agree to a substantial amount of time, and keep it to alternate weekends and one night a week for dinner. So what kind of message are we sending litigants here? Are we supposed to say you're supposed to be cooperative, work with the other person, give them enough time, and you'll be barred from ever seeking removal? Are you telling litigants that your right to removal is based on whether you accede to whatever request the other side makes? Are we telling litigants that from 03 to 07, you have to have had a perfect relationship with your ex-husband, an impossibility? Because I'll tell you, I guarantee you, from 03 to 08, he probably missed one day. She probably had a miscommunication. They were angry at each other. That's why they got divorced. But if you look at the objective criteria in this case, not one order, not one pleading, not one motion, not one email, and it all reflects any negative consequences to him. And that's why he has a good relationship with his daughter. And he calls her every night, not misses the phone contact, as they put in their brief, and why it's going to be upsetting to him if he moves. But that's the consequence of living in a society we live in. And to say that he's allowed to remarry someone who works in his office, and Sonia can enjoy a traditional family with a stepmom and a stepbrother in Chicago, but can't move into a stepfather's home with a stepsister who is 10 years old, who has been going out for two years now, who at trial testified they treat each other as sisters, two Indian girls, 8 and 10 years old, very close, that would go to the same school. To say that is inappropriate. This child spends 11 hours in daycare and school every day, five days a week, 12 months of the year. Both her parents work full time. Her standard of living and life will be measurably improved when a mom doesn't have to work, when she can walk to school and participate in extracurricular activities in a traditional family setting. Collingburn tells you that that's important. Thank you, Judge.